**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| INDIANA RAIL ROAD COMPANY, ASSOCIATION OF AMERICAN RAILROADS, and AMERICAN SHORT LINE AND REGIONAL RAILROAD ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> ILLINOIS COMMERCE COMMISSION, together with its members, CARRIE ZALEWSKI, BRIEN J. SHEAHAN, SADZI MARTHA OLIVA, D. ETHAN KIMBREL, and MARIA S. BOCANEGRA, in their official capacities, <br><br> Defendants. | No. 19-cv-06466 <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Indiana Rail Road Company ("INRD"), Association of American Railroads ("AAR"), and American Short Line and Regional Railroad Association ("ASLRRA") allege:

**PRELIMINARY STATEMENT**

1.      Congress has exercised broad regulatory authority over rail transportation for well over a century.  During that time, Congress and expert federal regulatory agencies, including the Federal Railroad Administration ("FRA"), have allowed railroads to set minimum crew sizes through collective bargaining, rather than imposing such requirements by law.

2.      In August 2019, Illinois enacted Public Act 101-0294 (the "Crew Size Law"), which imposes a categorical rule requiring that all freight railroads operate in almost all circumstances with at least two crew members.  Illinois enacted the Crew Size Law three months after FRA determined "that *no* regulation of train crew staffing is necessary or appropriate for

1

railroad operations to be conducted safely at this time." FRA, *Train Crew Staffing*, 84 Fed. Reg. 24,735, 24,735 (May 29, 2019) (emphasis added). Because it defies federal authority over railroads, the Crew Size Law is preempted by the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20106, the Regional Rail Reorganization Act ("3R Act"), 45 U.S.C. § 797j, and the ICC Termination Act ("ICCTA"), 49 U.S.C. § 10501(b), and is void and unenforceable under its own terms.

3.      The recent history of railroads confirms the wisdom of FRA's expert determination that minimum-crew-size laws are neither necessary nor appropriate. In recent decades, technological breakthroughs have allowed railroads to gradually decrease average crew sizes—from about five in the 1960s to just two today—while compiling an ever-improving record of safety. Now, the nation's railroads are poised to deliver even safer and more efficient service.

4.      FRA spent more than three years thoroughly considering an extensive evidentiary record—including comments, expert reports, and submissions from Plaintiffs INRD, AAR, and ASLRRA—and agreed not only that "existing one-person operations 'have not yet raised serious safety concerns'" but also that "'it is possible that one-person crews have contributed to the [railroads'] improving safety record.'" 84 Fed. Reg. at 24,739. And although FRA found no reliable or conclusive evidence that requiring minimum crew sizes would provide any safety benefit, it concluded that doing so would impose significant costs and stifle innovation.

5.      FRA reviewed evidence from the United States and other countries demonstrating that one-person crew operations are just as safe as multiple-person operations. INRD, for example, has operated trains with one-person crews in Illinois for more than 20 years. Its efficient staffing has allowed it to compete successfully with the trucking industry. And its

commitment to safety has led to an exemplary safety record.  INRD's experience and data confirm that one-person crews are just as safe as multiple-person crews.

6.      Based on its thorough analysis, FRA "determined that no regulation of train crew staffing is necessary or appropriate at this time" and announced its intent "to preempt all state laws attempting to regulate train crew staffing in any manner."  84 Fed. Reg. at 24,741.

7.      Illinois disagrees with FRA's expert assessment.  The Crew Size Law declares that "[i]t is the public policy of the State of Illinois to enhance public safety by establishing a minimum freight train operating crew size."  Crew Size Law, § 1.  To further that purported goal, the Crew Size Law mandates that "[n]o rail carrier shall operate or cause to operate a train or light engine used in connection with the movement of freight unless it has an operating crew consisting of at least 2 individuals."  Crew Size Law, § 5(2)(d).  When the Crew Size Law takes effect on January 1, 2020, Defendants Illinois Commerce Commission and its members Carrie Zalewski, Brien J. Sheahan, Sadzi Martha Oliva, D. Ethan Kimbrel, and Maria S. Bocanegra will have power to enforce the Crew Size Law, including by imposing onerous civil penalties.

8.      Plaintiffs seek a declaration that the Crew Size Law is preempted by FRSA, the 3R Act, and ICCTA.  In addition, Plaintiffs seek a declaration that the Crew Size Law is unenforceable by its own terms, as the Law contains a sunset provision specifying that it "shall remain in effect until a federal law or rule encompassing the subject matter has been adopted." Crew Size Law, § 5(2)(d).

9.      Plaintiffs also seek an injunction preventing Defendants from enforcing the Crew Size Law.  As explained below, the Crew Size Law cannot be squared with these federal laws or with Congress' extensive control over railroad operations.  If not enjoined, the Crew Size Law will cause serious and irreparable harm to Plaintiffs and their members, who will be put to the

untenable choice of defying the Crew Size Law and subjecting themselves to criminal and civil penalties, or complying with the Law and giving up their freedom under federal law to operate safely and efficiently, unencumbered by minimum-crew-size requirements.

**PARTIES**

10.     Plaintiff Indiana Rail Road Company operates a 250-mile regional railroad in central Illinois and central and southwest Indiana.  Headquartered in Indianapolis, Indiana, INRD provides rail-based transportation services to a diverse customer base, hauling more than 140,000 carloads of consumer, industrial, and energy products each year.

11.     For more than two decades, INRD has operated with one-person crews where it makes operational sense and creates efficiencies without compromising safety.  Over that time, INRD has used one-person crews and other innovative operating practices to compete effectively with the trucking industry, capturing substantial amounts of traffic that previously moved by trucking operations.  As a result, INRD has grown from 14,000 carloads in its first full year of operation to 146,050 carloads in 2018, and has grown from 16 employees to 135 employees in the same time frame.  INRD's experience and internal data show that one-person crews are just as safe as two-person crews.

12.     Plaintiff Association of American Railroads is a nonprofit trade association whose members include all of the Class I freight railroads (North America's largest freight railroads), smaller freight railroads, and passenger and commuter railroads.  AAR's members operate approximately 83 percent of the line-haul mileage, employ 95 percent of the workers, and account for 97 percent of the freight revenues of all railroads in the United States.  AAR and its members are committed to operating the safest, most efficient, cost-effective, and environmentally sound freight rail transportation system in the world.  AAR represents its member railroads in proceedings before Congress, administrative agencies, and the courts in

4

matters of common interest, such as the issues involved in this lawsuit. AAR members, including INRD, operate in Illinois.

13.     Plaintiff American Short Line and Regional Railroad Association represents more than 500 Class II and Class III railroads in the United States, Canada, and Mexico, as well as many suppliers and contractors to the short line and regional railroad industry. ASLRRA provides numerous resources to its members to promote safety, including safety training, compliance assessments, and awards to recognize those railroads that have outstanding safety records. ASLRRA advocates for its members in Congress, administrative agencies, and courts in matters of common interest, such as the issues involved in this lawsuit. ASLRRA members, including INRD, operate in Illinois.

14.     Defendants Carrie Zalewski, Brien J. Sheahan, Sadzi Martha Oliva, D. Ethan Kimbrel, and Maria S. Bocanegra are all members of the Illinois Commerce Commission (the "Commission"), also a named Defendant in this action. Those individuals were appointed by the Governor and confirmed by the Illinois State Senate for five-year terms. As of January 1, 2020, the Commission will have authority "with respect to freight train crew member size … to conduct evidentiary hearings, make findings, and issue and enforce orders, including sanctions." 625 Ill. Comp. Stat. 5/18c-7402(d) (effective Jan. 1, 2020).

## JURISDICTION AND VENUE

15.     This Court has jurisdiction of this action under 28 U.S.C. § 1331 because the case arises under (i) the Supremacy Clause of the Constitution of the United States, Article VI, clause 2; and (ii) the laws of the United States, including FRSA, the 3R Act, ICCTA, and 42 U.S.C. § 1983.

16. The Court has supplemental jurisdiction over Plaintiffs' state-law claim under 28 U.S.C. § 1367 because it arises from the same Illinois statute and forms part of the same case or controversy that gives rise to Plaintiffs' federal-law claims.

17. This Court may declare the legal rights and obligations of the parties in this action under 28 U.S.C. § 2201 because this action presents an actual controversy within the Court's jurisdiction.

18. Venue is proper in this district under 28 U.S.C. § 1391(b).

19. AAR and ASLRRA each have associational standing to bring this suit on behalf of their members because at least one of those members, including INRD, will be directly, adversely, and imminently affected by the Crew Size Law and thus would have standing to sue in their own right. If Defendants are not enjoined, AAR's and ASLRRA's members face the "immediate or threatened injury" of enforcement actions. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342 (1977). Furthermore, the interests that AAR and ASLRRA seek to protect by way of this lawsuit are germane to each organization's purpose. Finally, neither the claims asserted nor the relief requested requires an individual member of AAR or ASLRRA to participate in this suit.

## FACTS

### A. Background

20. "[T]echnology has enabled a gradual reduction in the number of train crewmembers from about five in the 1960s to two in 2014." FRA, *Train Crew Staffing*, 81 Fed. Reg. 13,918, 13,937 (Mar. 15, 2016) (notice of proposed rulemaking). Among the "technological breakthroughs" that enabled reduced crew sizes were the advent of diesel locomotives, which eliminated the need for firemen, and "end-of-train device[s]," which removed the need for a caboose and "one or more crewmembers to be at the rear of a train." *Id.*

Furthermore, as "remotely controlled locomotive operations" have "become widespread over the last 20 years," "utilizing only a one-person crew for switching service ha[s] become commonplace." *Id.*

21.     "[R]ailroads have achieved a continually improving safety record" over the same time period that average crew size has been reduced. 81 Fed. Reg. at 13,919. In 2018, accident rates had fallen 36 percent since 2000, and 77 percent since 1980. The rail employee injury rate had fallen 48 percent since 2000, and 84 percent since 1980. And the grade crossing collision rate was down 79 percent since 1980, and 36 percent since 2000. Recent years have been the safest in rail history.

22.     FRA has consistently refused to impose a minimum-crew-size requirement. *See*, *e.g.*, *Denial of BLET Petition on RCO and Other Single-Person Operations* (Nov. 10, 2009). Instead, debates over crew size have been resolved through collective bargaining between railroads and unions.

> **B.     FRA Concludes That No Crew-Size Regulation Is Necessary Or Appropriate For Train Safety.**

23.     For more than three years, FRA carefully considered whether to establish minimum requirements for the size of train crews before concluding "that no regulation of train crew staffing is necessary or appropriate for railroad operations to be conducted safely at this time." 84 Fed. Reg. at 24,735.

24.     FRA issued a notice of proposed rulemaking ("NPRM") in March 2016, proposing regulations for minimum crew size depending on the type of operations. 81 Fed. Reg. 13,918. FRA acknowledged that it could not "provide reliable or conclusive statistical data to suggest whether one-person crew operations are generally safer or less safe than multiple-person crew operations." *Id.* at 13,919.

25.     FRA's proposed regulations contemplated that one-person crew operations would be used in a variety of situations.  For example, the minimum-crew-size requirement would not have applied to most helper service, lite locomotive, work train, or certain remote control operations.  81 Fed. Reg. at 13,946-47.  FRA also proposed an exception for small railroads, permitting them to use one-person crew operations where train speeds did not exceed 25 mph and at locations without heavy grades.  *Id.* at 13,949.

26.     Moreover, FRA did not propose to stop existing one-person operations or to prohibit new operations.  Instead, FRA proposed to review one-person operations on a case-by-case basis and generally "plan[ned] to approve operations with less than two crewmembers where a railroad provide[d] a thorough description of that operation, ha[d] sensibly assessed the risks associated with implementing it, and ha[d] taken appropriate measures to mitigate or address any risks or safety hazards that might arise from it."  *Id.* at 13,957.

27.     Before issuing the NPRM, FRA tasked the Railroad Safety Advisory Committee ("RSAC"), FRA's federal advisory committee that has representatives from all of the agency's major stakeholder groups, with considering appropriate train crew size.  FRA lacked "reliable or conclusive statistical data to suggest whether one-person crew operations are safer or less safe than multiple-person crew operations."  84 Fed. Reg. at 24,735.  FRA "hoped that RSAC would provide useful analysis, including conclusive data addressing whether there is a safety benefit or detriment from crew redundancy (i.e., multiple-person train crews) and a report on the costs and benefits associated with crew redundancy."  *Id.*  But "the RSAC Working Group was unable to reach consensus on any recommendation or identify conclusive, statistical data to suggest whether there is a safety benefit or detriment from crew redundancy."  *Id.* at 24,736.  Thus, FRA issued the NPRM to "give the broader public an opportunity to provide input on th[e] issue."  *Id.*

8

28.     FRA received nearly 1,600 comments on the NPRM and held a public hearing. Plaintiffs INRD, AAR, and ASLRRA participated in the rulemaking by providing comments or supporting statements.  *See* 84 Fed. Reg. at 24,737.

29.     The evidence FRA received demonstrated that railroads in the United States and other nations have safely used one-person crews in a wide variety of operating contexts for many years.

30.     For example, FRA considered a 2015 study by the consulting firm Oliver Wyman that concluded, based on U.S. accident data, that single-person train crew operations are just as safe as multiple-person operations.  *See* Oliver Wyman, *Analysis of North American Freight Rail Single-Person Crews Safety and Economics*, Ex. A, FRA Docket No. FRA-2014-033-1474 (Feb. 2015), *available at* https://www.regulations.gov/document?D=FRA-2014-0033-1474.  The study compared aggregate statistics on relevant equipment incidents and casualty incidents for 2007 through 2013 for operators using single-person crews versus operators using multiple-person crews.  As to equipment incidents, the study found that "[w]hile the data may not conclusively support a claim that single-person crew operations are safer than multiple-person crew operations (given the possible existence of other influencing factors), it does appear that single-person crew operations are at least as safe as multiple-person crew operations."  *Id.* at 24.  As to casualty incidents, the study likewise found that "those rail operators using single-person crews are at least as safe as their counterparts relying on multiple-person crew[s] to operate their trains."  *Id.* at 26.

31.     FRA also considered a related study conducted by the consulting firm ICF International that forecast accident rates for one- and two-person crews.  *See* ICF Int'l, *Evaluation of Single Crew Risks*, Ex. C, FRA Docket No. FRA-2014-033-1474 (Jan. 2015),

*available at* https://www.regulations.gov/document?D=FRA-2014-0033-1474. That study found virtually no difference in accident rates between one- and two-person operations. *See id.* at 1. In fact, "[t]rain accidents due to rollaways decrease by a factor of 10 with the removal of a second person from the cab due to fewer potential situations and additional care taken when the sole operator leaves the cab." *Id.* at 5.

32.     And FRA reviewed evidence that one-person crews are commonly and safely used in other nations. *See* 81 Fed. Reg. at 13,932 (concluding that the "evidence … indicates that the safety records of these foreign operations are acceptable"). In fact, there is an extensive body of safety data documenting the performance of one-person crews in Europe. These data demonstrate that one-person operations are just as safe as two-person operations, for freight and passenger trains alike. *See* Oliver Wyman, *Analysis of European Railways*, Ex. B, FRA Docket No. FRA-2014-033-1474 (June 2016), *available at* https://www.regulations.gov/document?D= FRA-2014-0033-1474.

33.     After considering all of the comments and testimony, FRA found "that no regulation of train crew staffing is necessary or appropriate at this time." 84 Fed. Reg. at 24,737. The agency concluded: "[D]espite studying this issue in-depth and performing extensive outreach to industry stakeholders and the general public, FRA's statement in the NPRM that it 'cannot provide reliable or conclusive statistical data to suggest whether one-person crew operations are generally safer or less safe than multiple-person crew operations' still holds true." *Id.*

34.     In particular, "FRA's accident/incident safety data do[ ] not establish that one-person operations are less safe than multi-person train crews." 84 Fed. Reg. at 24,739 (footnote omitted). Reviewing data from a seventeen-year period ending in 2018, FRA "could not

determine that *any* of the accidents/incidents involving a one-person crew would have been prevented by having multiple crewmembers." *Id.* (emphasis added). Indeed, "existing one-person operations 'have not yet raised serious safety concerns' and, in fact, 'it is possible that one-person crews have contributed to the [railroads'] improving safety record.'" *Id.*

35. Moreover, the comments FRA received did "not provide conclusive data suggesting that there have been any previous accidents involving one-person crew operations that could have been avoided by adding a second crewmember or that one-person crew operations are less safe." 84 Fed. Reg. at 24,740.

36. Although FRA's extensive review did not suggest any safety *benefits* from establishing minimum-crew-size requirements, FRA concluded that establishing those requirements would impose significant *costs*. Specifically, "[a] train crew staffing rule would unnecessarily impede the future of rail innovation and automation." 84 Fed. Reg. at 24,740 (bold, italics and capitalization omitted). FRA explained that the Department of Transportation ("DOT") had "recognized that the integration of technology and automation across our transportation system has the potential to increase productivity, facilitate freight movement, create new kinds of jobs, and, most importantly, improve safety significantly by reducing accidents caused by human error." *Id.* "DOT's approach to achieving safety improvements begins with a focus on removing unnecessary barriers and issuing voluntary guidance, rather than regulations that could stifle innovation." *Id.* Establishing minimum-crew-size requirements would have imposed "a potential barrier to automation or other technology improvements" and could not be justified "without sufficient safety data showing the need for such a rule." *Id.*

37. Thus, FRA decided to withdraw the NPRM, publishing a final order to that effect on May 29, 2019. In doing so, FRA "determined that no regulation of train crew staffing is

necessary or appropriate at this time and intend[ed] for the withdrawal to preempt all state laws attempting to regulate train crew staffing in any manner." 84 Fed. Reg. at 24,741.

**C.     Illinois Enacts A Law Requiring Two-Person Crews.**

38.     Just over two months later, on August 9, 2019, Governor Pritzker signed the Crew Size Law, Public Act 101-0294, into law.

39.     Section 1 of the Crew Size Law declares that:

It is the public policy of the State of Illinois to enhance public safety by establishing a minimum freight train operating crew size to address the transportation of all freight, including, but not limited to, hazardous and volatile materials, on the railroads of Illinois. The transportation of this freight, coupled with substantially longer trains, creates significant health, safety, and security concerns for local communities. Adequate railroad operating personnel are critical to ensuring railroad operational safety and security and in supporting first responder activities in the event of a hazardous material incident, grade crossing incident, or mechanical failure.

40.     Section 5 of the Crew Size Law amends the Illinois Vehicle Code to provide that "[n]o rail carrier shall operate or cause to operate a train or light engine used in connection with the movement of freight unless it has an operating crew consisting of at least 2 individuals." Crew Size Law, § 5(2)(d).

41.     Unlike FRA's proposed regulation, which included significant exceptions from its two-person crew requirement for particular types of trains or trains operating under specified conditions, permitted existing one-person crew operations to continue, and contemplated new one-person operations with FRA approval, the Crew Size Law sets a stringent, across-the-board ban. The Crew Size Law applies to every freight train, except for "trains operated by a hostler service or utility employees." Crew Size Law, § 5(2)(d).

42.     The Crew Size Law contains a sunset provision, specifying that it "shall remain in effect until a federal law or rule encompassing the subject matter has been adopted." Crew Size Law, § 5(2)(d).

43.     Defendants are authorized, "with respect to freight train crew member size," to "conduct evidentiary hearings, make findings, and issue and enforce orders, including sanctions." Crew Size Law, § 5(2)(d). Those sanctions can include criminal misdemeanor penalties, daily civil penalties of up to $1,000 per violation, cease and desist orders, and injunctions. *See* 625 Ill. Comp. Stat. 5/18c-1704; *see also id.* at 5/18c-1701 ("Each day's continuance of a violation shall constitute a separate violation.").

44.     The Crew Size Law takes effect on January 1, 2020.

**D.     INRD Safely Uses One-Person Crew Operations In Illinois.**

45.     INRD began one-person crew operations in Illinois in 1997 and continues to use them today.

46.     Before beginning one-person operations, INRD consulted with FRA. INRD also studied the operations of New Zealand's Tranz Rail, which implemented one-person crews in 1987. INRD observed Tranz Rail's operating practices, reviewed its Alternative Train Crewing Handbook, interviewed employees, and discussed issues of alertness and fatigue with Tranz Rail officials. INRD also obtained information from a study performed by Tranz Rail that concluded that the health and safety of individuals and the public were not compromised by employing one-person operations. Finally, INRD considered suggestions and safety concerns of its own employees and management.

47.     INRD's evidence and data—collected over the more than two decades it has now been operating with one-person crews—establish that one-person crews are just as safe as two-person crews. INRD has had only one FRA-reportable human factor incident involving a one-person crew in 22 years of operations. From 2006 through 2013, one-person operations accounted for 24% of INRD man-hours, but only 5.7% of non-FRA reportable human factor incidents. Two-person crews, on the other hand, accounted for 76% of INRD man-hours, but

accounted for 94.3% of non-FRA reportable human factor incidents during that same time period.  And the Brotherhood of Locomotive Engineers and Trainmen has agreed to their members operating one-person trains on INRD, demonstrating that the union believes these operations are safe.

48.     If there were any objective or empirical evidence that operating with one-person crews endangered the safety of INRD employees or the public, INRD would not continue one-person operations regardless of the attendant efficiencies.  But there is simply no such evidence. To the contrary, INRD has complied a superb safety record while using one-person operations in Indiana and Illinois.

**E.     The Crew Size Law Will Injure Plaintiffs.**

49.     INRD and all other AAR and ASLRRA members operating in Illinois must comply with the Crew Size Law as of January 1, 2020.  Failure to comply with the Crew Size Law could result in significant penalties, while complying with the Crew Size Law will require INRD to give up its rights under federal law and abandon its collective bargaining agreement to operate one-person crews.

50.     The Crew Size Law thus will present INRD and other AAR and ASLRRA members with the Hobson's choice of complying with the Crew Size Law or suffering the threat of significant penalties.  *See*, *e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" existed where states "made clear that they would seek to enforce" law and plaintiffs faced "Hobson's choice" of "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" law); *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014) ("[a]bsent an injunction, [plaintiffs] will be forced either to incur the costs of compliance with a preempted state law or face the possibility of penalties").

14

51.     Even before the Crew Size Law takes effect, INRD must take significant steps to prepare to comply with the Law, including hiring and training additional crew members, and altering shift assignments and schedules.  INRD is also in mediation regarding the renegotiation of its collective bargaining agreement, a process that is clouded by legal uncertainty surrounding the Crew Size Law.  These injuries are magnified by the lack of any minimum-crew-size regulations in neighboring states—including Indiana, where INRD operates—meaning that INRD must adopt different approaches for operations on either side of the Illinois state line.

52.     Other AAR members that operate in Illinois will suffer the loss of their ability to use one-person crews in specific operational contexts.  For example, Union Pacific currently has the ability under its labor agreements to use one-person crews to operate remote control locomotives on the portion of its property that corresponds to the former Chicago & North Western.  Likewise, CSX currently has the flexibility to operate one-person remote control locomotives in Illinois.  These railroads will suffer the loss of these operational rights as soon as the Crew Size Law becomes effective.

53.     The members of AAR and ASLRRA will also suffer harm to their rights to collectively bargain over crew size.  More than 30 of the railroads open a new round of collective bargaining on November 1, 2019, prior to the effective date of the Crew Size Law.  Crew size is a mandatory subject of bargaining, and the carriers that operate in Illinois have the right to bargain for system-wide changes in crew size.  The Crew Size Law will interfere with the railroads' ability to expand their rights to operate with one-person crews in Illinois through collective bargaining.

54.     Plaintiffs have no adequate remedy at law for these harms that they will suffer, and therefore injunctive relief is appropriate.

15

## CLAIMS FOR RELIEF

### Claim One
### Preemption Under The Federal Railroad Safety Act

55.     Plaintiffs incorporate all preceding paragraphs by reference.

56.     When a state or local law conflicts with or stands as an obstacle to the objectives

of a federal law or intrudes on a field that Congress reserved for the federal government, the

Supremacy Clause of the Constitution of the United States preempts that state or local law.

57.     The Crew Size Law is expressly preempted by FRSA, 49 U.S.C. § 20106.

58.     In FRSA, Congress directed that "[l]aws, regulations, and orders related to

railroad safety" must be "nationally uniform to the extent practicable."  49 U.S.C. § 20106(a)(1).

To secure national uniformity, FRSA provides that a state law is preempted when FRA, under

authority delegated from the Secretary of Transportation, "prescribes a regulation or issues an

order covering the subject matter of the State requirement."  § 20106(a)(2).  A federal regulation

or order covers the subject matter of a state law when "the federal regulations substantially

subsume the subject matter of the relevant state law."  *CSX Transp., Inc. v. Easterwood*, 507 U.S.

658, 664-65 (1993).

59.     In withdrawing its notice of proposed rulemaking regarding train crew size, FRA

"determined that no regulation of train crew staffing is necessary or appropriate at this time and

intend[ed] for the withdrawal to preempt all state laws attempting to regulate train crew staffing

in any manner."  84 Fed. Reg. at 24,741.  As FRA explained, a federal determination not to

regulate can "'take[ ] on the character of a ruling that no such regulation is appropriate or

approved pursuant to the policy of the statute,'" and thus "any state law enacting such a

regulation is preempted."  *Id.* (quoting *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978));

*accord BNSF Ry. Co. v. Doyle*, 186 F.3d 790, 801 (7th Cir. 1999) ("When the FRA examines a

16

safety concern regarding an activity and affirmatively decides that no regulation is needed, this has the effect of being an order that the activity is permitted.").

60.     That is precisely what FRA did with respect to minimum crew size: "After closely examining the train crew staffing issue and conducting significant outreach to industry and public stakeholders, FRA determined that issuing any regulation requiring a minimum number of train crewmembers would not be justified because such a regulation is unnecessary for a railroad operation to be conducted safely at this time." 84 Fed. Reg. at 24,741.  Thus, FRA's notice withdrawing its proposed regulation of train crew size "provide[d] FRA's determination that no regulation of train crew staffing is appropriate" and conveyed FRA's intent "to negatively preempt any state laws concerning that subject matter." *Id.*

61.     Because FRA "examine[d] a safety concern regarding [train crew staffing] and affirmatively decide[d] that no regulation is needed," its order withdrawing the NPRM "has the effect of being an order that the activity is permitted."  *Doyle*, 186 F.3d at 801.

62.     The Crew Size Law is preempted by FRSA because the Crew Size Law mandates a minimum number of crew members, despite FRA's determination that no regulation of train crew staffing is necessary or appropriate.  FRA's "order covering the subject matter" of minimum crew size leaves no room for Illinois to adopt or continue in force a law regulating train crew staffing.  49 U.S.C. § 20106(a)(2).

**Claim Two**
**<u>Preemption Under The Regional Rail Reorganization Act</u>**

63.     Plaintiffs incorporate all preceding paragraphs by reference.

64.     When a state or local law conflicts with or stands as an obstacle to the objectives of a federal law or intrudes on a field that Congress reserved for the federal government, the Supremacy Clause of the Constitution of the United States preempts that state or local law.

17

65.     The Crew Size Law conflicts with and is expressly preempted by Section 711 of the Regional Rail Reorganization Act ("the 3R Act"), as amended by Section 1143(a) of the Northeast Rail Service Act, 45 U.S.C. § 797j.

66.     As amended, Section 711 of the 3R Act provides that:

No state may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation [Conrail] to employ any specified number of persons to perform any particular task, function, or operation, or requiring the Corporation to pay protective benefits to employees, and *no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region.*

45 U.S.C. § 797j (emphasis added).

67.     Illinois is a "State in the Region" as defined by Section 102 of the 3R Act, *see* 45 U.S.C. § 702(17) & (19).

68.     The railroads that operate in Illinois are "railroad[s] in the Region" as defined by Section 102 of the 3R Act, *see* 45 U.S.C. § 702(15) & (17).

69.     As the statutory text reflects, this express preemption provision applies to *all* railroads in the specified area, not just to Conrail and its successors. *See Norfolk & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 582 F. Supp. 1552, 1556 (Reg'l Rail Reorg. Ct. 1984) ("The legislative goal was to give Conrail the opportunity to become profitable, but not necessarily to disadvantage all other railroads at the same time.").

70.     Because the Crew Size Law specifies that "at least 2 individuals" must be used to operate any freight train or light engine, Crew Size Law, § 5(2)(d), it is a "law" requiring a "specified number of persons to perform any particular task, function, or operation," 45 U.S.C. § 797j.

71.     Because the Crew Size Law requires freight railroads in the Region, including INRD, to employ a specified number of persons to operate any train or light engine, Crew Size

18

Law, § 5(2)(d), it conflicts with and is preempted under the 3R Act, as amended. *See, e.g.*, *Norfolk & W. Ry. Co. v. Pub. Serv. Comm'n of W. Va.*, 858 F. Supp. 1213, 1214 (Reg'l Rail Reorg. Ct. 1994) (West Virginia crew-size statute preempted).

## Claim Three
## Invalidity And Unenforceability Of The Crew Size Law Under The Sunset Provision

72.     Plaintiffs incorporate all preceding paragraphs by reference.

73.     By its own terms, the Crew Size Law provides that it "shall remain in effect *until* a federal law or rule encompassing the subject matter has been adopted." Crew Size Law, § 5(2)(d) (emphasis added).

74.     FRA adopted a federal rule encompassing the subject matter when it determined that "no regulation of train crew staffing is necessary or appropriate at this time." 84 Fed. Reg. at 24,741.

75.     Congress adopted a federal law encompassing the subject matter when it provided that "no State in the Region may adopt or continue in force" a law regulating minimum crew size "with respect to any railroad in the Region." 45 U.S.C. § 797j.

76.     Thus, the Crew Size law is ineffective and unenforceable under its own terms.

## Claim Four
## Preemption Under The ICC Termination Act

77.     Plaintiffs incorporate all preceding paragraphs by reference.

78.     When a state or local law conflicts with or stands as an obstacle to the objectives of a federal law or intrudes on a field that Congress reserved for the federal government, the Supremacy Clause of the Constitution of the United States preempts that state or local law.

79.     The Crew Size Law conflicts with and is preempted by ICCTA, which provides that "[t]he jurisdiction of the [Surface Transportation Board] over … transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules

(including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers … is *exclusive*."  49 U.S.C. § 10501(b) (emphasis added).

80.    Because ICCTA's remedies are "exclusive," they "preempt the remedies provided under Federal or State law."  49 U.S.C. § 10501(b).

81.    "Congress's intent in [ICCTA] to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping."  *Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011) (collecting cases).  "Congress recognized that continuing state regulation—of intrastate rail rates, for example—would risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation."  *Iowa, Chi. & E. R.R. Corp. v. Wash. Cty.*, 384 F.3d 557, 559 (8th Cir. 2004).

82.    ICCTA "preempts *all* state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation."  *Delaware v. STB*, 859 F.3d 16, 18 (D.C. Cir. 2017) (emphasis added).  "[S]tate or local statutes or regulations are preempted *categorically* if they have the effect of managing or governing rail transportation."  *Id.* at 19 (emphasis added; quotation marks omitted).  And even state laws "that are not categorically preempted may still be impermissible if, as applied, they would have the effect of unreasonably burdening or interfering with rail transportation."  *Id.*

83.    The Crew Size Law conflicts with and is preempted by ICCTA because it will manage, govern, unreasonably burden, and unreasonably interfere with rail transportation.  When the Crew Size Law takes effect, it will forbid freight railroads from operating with a single crew member.  Under the Law, it does not matter whether operating with a single crew member is just as safe as operating with multiple crew members, whether a railroad operates with a single crew

member in adjacent states, or even whether the railroad has a collective bargaining agreement permitting single-person operations. INRD, for example, will need to alter its operations to ensure that it adds an additional crew member when its trains cross from Indiana to Illinois. The Crew Size Law thus imposes the balkanized system of transportation regulations that ICCTA was designed to prevent.

### Claim Five
### Declaratory Relief Under 28 U.S.C. § 2201

84.  Plaintiffs incorporate all preceding paragraphs by reference.

85.  This action presents an actual case or controversy between Plaintiffs and Defendants concerning the validity and enforceability of the Crew Size Law.

86.  Because the Crew Size Law violates FRSA, the 3R Act, as amended, and ICCTA, Plaintiffs seek and are entitled to a declaration under 28 U.S.C. § 2201 that the Crew Size Law is invalid and unenforceable for the reasons stated above.

87.  Additionally, because FRA has adopted a federal rule and Congress has adopted a federal law "encompassing the subject matter" of minimum-crew-size requirements, Crew Size Law, § 5(2)(d), *see* 84 Fed. Reg. at 24,741; 45 U.S.C. § 797j, Plaintiffs seek and are entitled to a declaration under 28 U.S.C. § 2201 that the Crew Size Law is invalid and unenforceable under its own terms.

### Claim Six
### Injunctive Relief Under 42 U.S.C. § 1983 And The Court's Equitable Powers

88.  Plaintiffs incorporate all preceding paragraphs by reference.

89.  Under 42 U.S.C. § 1983 and the Court's equitable powers, Plaintiffs are entitled to injunctive relief against Defendants, whose enforcement of the Crew Size Law against INRD, AAR and its members, or ASLRRA and its members would conflict with and violate FRSA, the 3R Act, as amended, and ICCTA, as well as the Crew Size Law itself.

90.     INRD and the members of AAR and ASLRRA would suffer irreparable harm for which they have no adequate remedy at law if the Crew Size Law is not enjoined.

91.     The balance of harms and the public interest weigh heavily in favor of injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs INRD, AAR, and ASLRRA respectfully request that this Court:

A.     Declare that the Crew Size Law violates and is preempted by FRSA, the 3R Act, as amended, and ICCTA;

B.     Declare that the Crew Size Law is invalid and unenforceable under its own sunset provision;

C.     Preliminarily and permanently enjoin Defendants, as well as their officers, agents, servants, employees, and attorneys, and those persons in concert or participation with them, from taking any action to enforce the Crew Size Law against INRD, AAR or its members, or ASLRRA or its members;

D.     Award INRD, AAR, and ASLRRA their reasonable costs and attorney's fees under 42 U.S.C. § 1988; and

E.     Grant INRD, AAR, and ASLRRA any other relief this Court deems just and proper.

Dated:  September 30, 2019

                                        Respectfully submitted,

                                        /s/ Thomas H. Dupree Jr.

| | |
|---|---|
| Daniel J. Mohan | Thomas H. Dupree Jr. |
| Sean M. Sullivan | Jacob T. Spencer |
| DALEY MOHAN GROBLE, P.C. | GIBSON, DUNN & CRUTCHER LLP |
| 55 West Monroe, Ste. 1600 | 1050 Connecticut Avenue, NW |
| Chicago, IL  60603 | Washington, DC  20036 |
| (312) 422-0786 | (202) 955-8500 |
| mohan@daleymohan.com | tdupree@gibsondunn.com |
| | |
| | Kathryn D. Kirmayer |
| | Sarah Yurasko |
| | ASSOCIATION OF AMERICAN RAILROADS |
| | 425 Third Street, SW, Suite 1000 |
| | Washington, DC  20024 |
| | (202) 639-2508 |

*Attorneys for Plaintiffs INRD, AAR, and ASLRRA*